Filed 4/9/21  P. v. Tobar CA1/2
Opinion following rehearing
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>GUILLERMO ALFREDO TOBAR,<br><br>     Defendant and Appellant. | A155289<br><br>(San Mateo County<br>Super. Ct. No. 16SF004152) |

Guillermo Alfredo Tobar appeals from orders placing him on supervised probation following his conviction of assault by means of force likely to produce great bodily injury.  He challenges several of the conditions of his probation as unreasonable and overbroad.[1]  He also contends the term of probation must be reduced pursuant to legislation enacted subsequent to sentencing.  We agree with the latter contention and will order the term of probation reduced to two years.

---

[1] Appellant initially challenged the trial court's imposition of a $300 restitution fine, $30 court facilities fee, and $40 court operations fee without first determining appellant's ability to pay, based upon *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  He subsequently withdrew this claim, conceding the record indicates he has the ability to pay the fine and fees.

1

# BACKGROUND

About 12:50 p.m. on September 5, 2015, on a street in Redwood City, appellant knocked Jaime Torres to the ground, hit him in the head a number of times, and left him unconscious. The assault occurred in the intersection of Woodside Road (a multilane, divided roadway) and Hudson Street.

Torres, who was unemployed and homeless, testified that on the morning of the incident, he had had two 24-ounce cans of beer and was "a little bit buzzed" but not drunk. He had gone to a tattoo studio to say hello to the owner, and when he went outside to smoke a cigarette, appellant, who was outside Villa Roma bar about two doors down, "wanted to pick a fight." Torres had never seen appellant before. Torres was about five foot nine inches tall, weighed about 125 pounds and was not in good physical health: He had had two stress fractures and had just gotten out of a wheelchair that same weekend.

As appellant approached him, Torres started to leave, crossing Woodside Road toward a Shell gas station. Appellant ran toward him and started hitting him, and the next thing Torres knew, he woke up on the ground. He denied punching or kicking appellant.

Torres suffered a broken nose and what he believed was a "little fracture" of his jaw, neither of which required surgery. For about a month and a half after the incident, his nose was swollen, chewing was painful, and he took prescribed pain medication; at the time of trial in 2018, he still could not breathe as clearly through his nose as he had been able to before. He testified that his tooth was chipped during the incident, but hospital records indicated he had no chipped teeth. Hospital records showed Torres's blood alcohol level was 0.263.

A woman stopped at the traffic light at the intersection of Woodside and Hudson saw an "older gentleman" walking "normally" across the street and a younger person walking fast behind him, yelling, and appearing angry. The younger person caught up to the older one in front of the woman's car, hit him "very strongly" and threw him to the ground. She testified, "You could tell he was very angry, very upset. They were blows like he couldn't control himself. They were not little blows." The younger man kneeled down and hit the older one in the face eight to ten times; the older man "was hiding himself" and "pulling his hands so he would not get hit," and did not defend himself or say anything. The woman honked her horn repeatedly, then got out of her car, telling the younger man to stop and asking what happened, but he "was not listening to reasons," seemed to have "lost control" and kept hitting the other man for a few more seconds. He said the other man had insulted him and said things about his family. As other people got close, the younger man walked away. The older man, on the ground, was unconscious.

An off-duty California Highway Patrol officer who was driving by saw two people running through the intersection, initially about five or six feet from each other. The one in front was smaller and skinnier and looked frightened, while the one behind, who was going faster, was larger and looked very angry. When the second man caught up to the first, the latter dropped to the ground on his back as the larger man kneeled over him and struck his face repeatedly. The officer did not hear any words exchanged, and did not see the smaller man do anything. As the officer called 911, the man who had been doing the punching stood up and started walking away, and the officer parked his vehicle and walked in the direction the man had gone. He saw the man walking east, his gait "a little bit faster than a walk" but not running,

3

and followed until the man went over a barbed wire fence topped with spiral razor wire.

A witness who was walking across Woodside Road saw a man step from the sidewalk into the crosswalk as another man ran toward him from the far side of Woodside, grabbed and threw him to the ground and hit him forcefully eight or nine times. Another witness noticed a group of people outside a tattoo parlor engaged in a loud and angry conversation, then saw a man walk from the tattoo parlor across the intersection, yelling, and another person walk or run across, knock the first man down, hit him hard in the head four or five times, then get up and walk or run away.

A Redwood City police officer who was looking for the suspect described in the reported battery saw appellant crossing a street a short distance from the intersection. Appellant was not wearing a shirt and was bleeding from his arm and leg. The officer activated his patrol vehicle's emergency lights and appellant, who was looking toward the vehicle, ran down an alley between two houses. The officer drove to the next street, where he saw appellant exiting a driveway and ordered him to stop and get on the ground. Appellant cooperated.

Appellant testified that on the morning of September 5, 2015, after drinking a screwdriver at the Villa Roma bar, he went to the tattoo shop with his friend. Someone behind appellant—Torres—said, "Giants are a bunch of . . . fagots" and "[a]nyone that's from San Francisco is a bunch of fagots." Appellant thought the comment was directed at him because he was wearing a Giants hat. Torres was asked to leave the shop but stayed in front of the window outside. As appellant and his friend left to return to the Villa Roma, Torres came at appellant, saying, 'I put spics like you in the ground," and they both fell against the glass window. People from the tattoo parlor came

4

out and "formed a wall," escorting Torres off the property while Torres tried to "push and fight his way through, screaming, 'I'm going to fucking kill you. I'm going to fucking stab you.' "  Appellant went into the bar with his friend. He was confused and "kind of scared" but not angry, and did not yell anything at Torres.

When appellant left to do errands 10 or 15 minutes later, he did not see Torres outside.  Appellant walked to the crosswalk and saw Torres on the street yelling, "I'm going to fucking kill you" and waving his hand, then pointing at appellant while making a gesture that looked to appellant like "slit your throat."  Appellant assumed Torres had a knife because he had said he was going to stab appellant, and was afraid Torres might come after him if he ran away, so he "confronted him, put him down to the ground, made sure he wouldn't come up and get me."  Appellant said he hit Torres four or five times, then got up and went to Petco.  He heard what sounded like someone chasing him, thought it was Torres or his friends, and wanted to avoid confrontations and get somewhere safe.  He left Petco, went to the nursery, and jumped the fence, cutting his wrist and leg on the razor wire on top.  He then heard sirens coming, went toward them and surrendered to the police. Appellant denied seeing a police car with its lights on and testified that what the officer described about him looking at the patrol vehicle and then running down an alley never happened.

Appellant's friend Samuel White supported appellant's account of the first part of the incident.  He testified that he recognized the man in the tattoo parlor, who appeared intoxicated and said, " 'F the Giants,' " as a "vagrant" and "local at the liquor store."  The man was told to leave and escorted out, but remained outside the window.  As White and appellant walked back to Villa Roma, the man was "talking trash" and they ignored

5

him.  White heard a thump against the glass and saw the man bump into appellant.  Appellant did not appear to be angry.  White remained in the bar when appellant left to do errands and did not see the assault.

Torres completely denied appellant's account of the events preceding the assault.  He testified that he did not see appellant in the tattoo shop and was not kicked out of the shop; denied calling Giants fans or people from San Francisco "fagots" and testified the Giants are his favorite baseball team and he has "Giants" tattooed on his hand.  He denied saying, "I put spics like you in the ground," saying, "I'm Mexican.  Why would I say something like that?"  He denied threatening to kill appellant and his family, yelling at appellant from the street or drawing his finger across his throat and, shown a video taken by the surveillance camera at the Shell station, said his hand gesture was trying to tell appellant to leave him alone.  He denied attacking appellant outside the tattoo shop and testified his only involvement in fights in his life had been to defend himself, never to start a fight, but acknowledged having been convicted of domestic violence offenses in 2006 and 2008.

Appellant was charged by information filed on November 7, 2016, with one count of felony assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)),[2] with an alleged enhancement for personal infliction of great bodily injury upon the victim (§ 12022.7, subd. (a)).  A jury found him guilty of the assault but found the great bodily injury enhancement not true.  The court suspended imposition of sentence and placed appellant on four years' supervised probation.

This timely appeal followed.

---

[2] Further unspecified statutory references are to the Penal Code.

6

## DISCUSSION

Appellant challenges probation conditions prohibiting him from using or possessing marijuana, prohibiting him from possessing any dangerous or deadly weapon, requiring him to submit to chemical testing for the detection of marijuana, and requiring him to submit to warrantless searches. He contends all four conditions are unreasonable under *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*), and the chemical testing and search conditions are also unconstitutionally broad.

### I.

" 'The primary goal of probation is to ensure "[t]he safety of the public . . . through the enforcement of court-ordered conditions of probation." (Pen. Code, § 1202.7.)' (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120 (*Carbajal*).) Accordingly, the Legislature has empowered the court, in making a probation determination, to impose any 'reasonable conditions, as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer. . . .' (Pen. Code, § 1203.1, subd. (j).)" (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*).)

"Generally, '[a] condition of probation will not be held invalid unless it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality. . . ." [Citation.]' (*Lent, supra,* 15 Cal.3d at p. 486.) This test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term. (*Id.* at p. 486, fn. 1; see also *People v. Balestra* (1999) 76 Cal.App.4th 57, 68–69 (*Balestra*).) As such, even if a condition of probation has no relationship to

7

the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality.  (See *Carbajal, supra,* 10 Cal.4th at 1121.)" (*Olguin, supra,* 45 Cal.4th at pp. 379–380.)

Appellant argues the four probation conditions at issue meet all three prongs of the *Lent* test.  First, he maintains the marijuana and weapons conditions are not reasonably related to his offense because there is no evidence either played a role in that offense; the chemical testing condition is unrelated because it was imposed only to monitor for marijuana use; and the search condition is unrelated because the offense did not involve weapons or any concealed items.  Second, the conditions relate to conduct not in itself unlawful:  As an adult, appellant is legally permitted to use marijuana (Health & Saf. Code, § 11362.1); possession of a deadly or dangerous weapon is not necessarily unlawful (*In re Martinez* (1978) 86 Cal.App.3d 577, 581 (*Martinez*)); and appellant has a right to refuse to submit to warrantless and unreasonable searches.  Third, appellant argues there is an insufficient relationship between the conditions and preventing future criminality to satisfy the last prong of the *Lent* test, which "requires more than just an abstract or hypothetical relationship." (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1121 (*Ricardo P.*).)

Appellant did not challenge the probation conditions in the trial court, and he acknowledges that failure to do so generally forfeits the issue for appeal.  (*People v. Welch* (1993) 5 Cal.4th 228, 237.)  He urges us to exercise our discretion to hear the merits (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6) or, alternatively, find his attorney was ineffective for failing to object that the conditions were invalid under *Lent.*

8

Appellant does not make a compelling case for exercising our discretion to excuse his forfeiture. His argument that a favorable decision would eliminate burdensome conditions he is currently required to comply with does not distinguish him from any other probationer. His other argument is that the California Supreme Court's decision in *Ricardo P.*, demonstrates the law is still evolving with respect to when a probation condition is reasonably related to future criminality, and we could offer "post-*Ricardo P.* guidance" on the issue. The issues in *Ricardo P.,* which examined the propriety of requiring juvenile probationers to submit to searches of their electronic devices, differ considerably from those involved in the relatively standard probation conditions at issue here.

As for ineffective assistance of counsel, it is appellant's burden to " 'demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the [defendant] to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the [defendant]. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *In re Wilson* (1992) 3 Cal.4th 945, 950.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, . . .* at p. 694.)' (*In re Neely* (1993) 6 Cal.4th 901, 908–909.)" (*In re Jones* (1996) 13 Cal.4th 552, 561.) There is "a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436, quoting *Strickland*, at p. 689) and on direct appeal we will reverse only if the record " ' "affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' " (*Lucas,* at p. 437, quoting *People v. Zapien* (1993) 4 Cal.4th 929, 980.)

Here, the record offers no explanation for defense counsel's failure to object to the probation conditions appellant now challenges. Counsel appears to have represented appellant diligently: He argued vigorously for the court to reduce appellant's offense to a misdemeanor, portraying the assault as "aberration" that would not recur, and objected to a restitution order even after, in response to his attempt to ask a question about the alcohol condition, the court admonished him for not raising his questions when the court asked for comments before imposing sentence. With the prosecutor pursuing a prison term and disagreeing with the probation department's assessment that appellant showed remorse for his conduct, defense counsel may have considered it prudent to accede to the imposition of standard probation conditions such as the ones at issue here in order to increase the likelihood of the court granting probation. Or counsel may have considered it likely the trial court would view any objection to these conditions as meritless. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.) "Counsel is not required to proffer futile objections." (*People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Jackson* (1989) 49 Cal.3d 1170, 1189.)

Viewing an objection to the conditions as futile would not have been unreasonable, as the conditions imposed appear to be within the trial court's discretion. The marijuana prohibition is part of a condition requiring appellant to "abstain from the use, possession, custody, and control of all alcohol and controlled substances including marijuana." There is no evidence marijuana played any role in the current offense, and the only reference to marijuana in the probation report is to appellant's statement that "he started using marijuana and alcohol at age 17, but he has never used these substances regularly." Notably, however, appellant does not challenge the alcohol condition, which is plainly related to the offense and future

10

criminality.  Appellant told the probation officer he currently drinks alcohol "on occasion," but " 'never' drinks at home."  But he was convicted of misdemeanor alcohol-related reckless driving in 2011, after being charged with driving under the influence and possession of controlled substance paraphernalia, and the record reflects that he was drinking with friends at the Villa Roma bar just before the incident—albeit, by his own report, a single screwdriver.

Cases have recognized a connection between alcohol and drugs with respect to probation conditions, upholding alcohol prohibitions in cases where the defendant's offense related to drug use because of alcohol's similar effects in impairing judgment and the ability to control behavior.  (*People v. Smith* (1983) 145 Cal.App.3d 1032, 1034–1035 [commenting on similarity of effects of alcohol to effects of marijuana and other drugs, including "lessening of internalized self-control"]; *People v. Lindsay* (1992) 10 Cal.App.4th 1642, 1645 [impairment of judgment due to alcohol consumption could reduce drug addict's willpower to refrain from drug use]; *People v. Beal* (1997) 60 Cal.App.4th 84, 87 [alcohol use related to future criminality where defendant has history of substance abuse]; *People v. Malago* (2017) 8 Cal.App.5th 1301, 1308 [avoiding alcohol would increase defendant's ability to avoid drug use].)

Appellant argues that any limited role of alcohol in the present case falls far short of the level of substance abuse that justified the probation conditions in the cited cases.  But the critical point is not the degree of substance abuse; it is the effect of drugs or alcohol on judgment and self-control.  Appellant committed a violent assault that the trial court viewed as clearly reflecting an absence of self-control.  While there was no evidence one way or the other as to appellant's level of intoxication at the time, he admitted having had a drink just before the incident, and his conviction for

11

alcohol-related reckless driving certainly suggests a lack of control tied to alcohol. Requiring appellant to avoid substances with a tendency to impair his judgment and self-control—marijuana as well as alcohol—was not an abuse of discretion.

Appellant's reliance upon *People v. Burton* (1981) 117 Cal.App.3d 382 is not persuasive. *Burton* invalidated a probation condition prohibiting use of "intoxicants" in the case of a defendant who assaulted a co-worker with a lead pipe, finding the record "devoid of any evidence that [the defendant] had consumed alcoholic beverage prior to, during, or after the assault" and no evidence he "had ever been convicted of an alcohol-related offense and/or that he had manifested a propensity to become assaultive while drinking." (*Id.* at p. 390.) As we have indicated, the record here is not similarly devoid of evidence that alcohol played some role in appellant's offense and past misconduct, and the prohibition against marijuana use is justifiable based on that evidence.

Appellant's challenge to the chemical testing condition fails because it is dependent upon his view that the marijuana condition was invalid, which we have rejected.

With respect to the weapons and search conditions, appellant relies heavily upon *Martinez, supra,* 86 Cal.App.3d 577. The defendant in *Martinez* was part of a crowd yelling obscenities and throwing beer cans and bottles at police officers impounding an illegally parked vehicle. (*Id.* at p. 579.) He pled guilty to misdemeanor battery on a police officer based on having thrown a beer bottle at a police car, and challenged a probation condition requiring him to submit to warrantless searches. (*Ibid.*) Acknowledging that "indiscriminate searching of all persons for weapons could abstractly be related to preventing future crime," the *Martinez* court struck the search

condition, stating that the test "is more precise" and requires a "factual 'nexus' between the crime, defendant's manifested propensities, and the probation condition," and nothing in the defendant's history or circumstances of the offense "indicate a propensity on the part of the defendant to resort to the use of concealed weapons in the future. (*Id.* at p. 583.) Although the defendant did not challenge a probation condition prohibiting possession of dangerous or deadly weapons, in rejecting the Attorney General's argument that a search condition can reasonably be imposed whenever a concealable weapons condition is validly imposed, the court observed that the weapons prohibition was not related to the defendant's crime. (*Id.* at pp. 581–582.)

The reasoning of *Martinez* is undermined by the court's reliance upon a case, *People v. Keller* (1978) 76 Cal.App.3d 827 (*Keller*), that has since been disapproved by the court that wrote it, finding it went "far beyond the *Lent* test" and was inconsistent with subsequent Fourth Amendment jurisprudence. (*Balestra, supra,* 76 Cal.App.4th at pp. 66–67.)[3] The *Martinez*

_____

[3] As described in *Balestra, supra,* 76 Cal.App.4th at page 66, *Keller* "went far beyond the *Lent* test to list a total of seven factors we would require to uphold a probation condition, including what we deemed a constitutional 'mandate' that a probation 'condition[ ] be *reasonable*, reasonable in proportion, as well as reasonably related, to the crime committed.' ([*Keller, supra,* 76 Cal.App.3d] at p. 838.)" The fundamental problem in *Keller* was that imposing a warrantless search condition in that case, where the defendant was convicted of petty theft for stealing a 49 cent ball point pen, was "like 'the use of a Mack truck to crush a gnat.' " (*Balestra,* at p. 66, quoting *Keller,* at p. 840.) *Martinez* stated its approval of the approach taken in *Keller,* which it described as having "placed a 'gloss' on the three-pronged *Lent* test by adding an overall requirement of reasonableness in relation to the seriousness of the offense for which defendant was convicted," and as holding that, in addition to failing the *Lent* test, the search condition was "in any event unreasonable in a case of such minor importance." (*Martinez, supra,* 86 Cal.App.3d at p. 584.)

court's emphasis on the required "factual 'nexus' " to the offense is also undermined by *Ricardo P.* Responding to the argument that *Lent's* third prong requires " 'a nexus between the probation condition and the defendant's underlying offense or prior offenses," the Supreme Court stated, "We would not go that far. Requiring a nexus between the condition and the underlying offense would essentially fold *Lent's* third prong into its first prong. We have said that 'conditions of probation aimed at rehabilitating the offender need not be so strictly tied to the offender's precise crime' ([*People v.*] *Moran* [(2016)] 1 Cal.5th [398,] 404–405) so long as they are 'reasonably directed at curbing [the defendant's] future criminality' (*id.* at p. 404)." (*Ricardo P., supra,* 7 Cal.5th at p. 1122.)

In any event, *Martinez* is plainly distinguishable from the present case. As the *Martinez* court noted, the facts of that case were "unique." (*Martinez, supra,* 86 Cal.App.3d at p. 582.) The defendant's offense was a misdemeanor that did not involve use of a deadly or dangerous weapon and did not result in injury, he had no criminal history, and the probation officer described his conduct as " 'an isolated situation.' " (*Ibid.*) Even as *Martinez* rejected the proposition that prohibiting possession of dangerous or deadly weapons is reasonable in "all cases of assault by any means," the court declined to hold "that in all cases where a defendant is convicted of an assault not involving the use of dangerous or deadly weapons, imposition of such a condition would per se be unreasonable," and acknowledged that "the propensities of the

*People v. Burton, supra,* 117 Cal.App.3d at pages 391 and 392, relied upon both *Keller* and *Martinez.* Whatever question might be raised about its reasoning on that basis, however, *Burton* was cited in *Ricardo P., supra,* 7 Cal.5th at pages 1121 and 1122, as one example of cases recognizing that "*Lent's* third prong requires more than just an abstract or hypothetical relationship between the probation condition and preventing future criminality."

individual defendant as manifested by the present offense and past behavior[] may justify such a condition in order to deter future criminality." (*Id.* at p. 581.)

Here, appellant committed a violent assault that caused the victim to lose consciousness and resulted in injuries that were significant despite the jury's conclusion that they did not amount to great bodily injury. Appellant was described by witnesses as acting in an uncontrolled rage, and the court viewed his conduct as an inexplicable response to the words of a known "drunk" and "transient." In these circumstances, the weapons condition can reasonably be seen as a means of protecting against the potential for an even more serious assault in the future.

The *Martinez* court's invalidation of the warrantless search condition in that case was obviously influenced by the court's conclusion that the weapons condition was invalid. Here, the enforcement of several properly imposed probation conditions would be served by the search condition, including the marijuana and weapons prohibitions, as well as the unchallenged alcohol prohibition. "[A] warrantless search condition is intended to ensure that the subject thereof is obeying the fundamental condition of all grants of probation, that is, the usual requirement (as here) that a probationer 'obey all laws.' Thus, warrantless search conditions serve a valid rehabilitative purpose, and because such a search condition is necessarily justified by its rehabilitative purpose, it is of no moment whether the underlying offense is reasonably related to theft, narcotics, or firearms: 'The threat of a suspicionless search is fully consistent with the deterrent purposes of the search condition. " 'The purpose of an unexpected, unprovoked search of defendant is to ascertain whether [the probationer] is complying with the terms of [probation]; to determine not only whether he disobeys the law, but

also whether he obeys the law. *Information obtained under such circumstances would afford a valuable measure of the effectiveness of the supervision given the defendant . . . .'"* [Citations.]' (*People v. Reyes* (1998) 19 Cal.4th 743, 752, italics added.)" (*Balestra, supra,* 76 Cal.App.4th at p. 67, fn. omitted.)[4]

Appellant urges that the California Supreme Court, in *Ricardo P.*, "firmly rejected the argument that a finding of reasonableness under *Lent's* third prong is compelled whenever a probation condition might aid a probation in ascertaining the probationer's compliance with other conditions of supervision." To the extent appellant means to suggest the search condition here cannot be justified by reference to enforcement of the weapons, marijuana and alcohol conditions, his reliance upon *Ricardo P.* misses the mark. What *Ricardo P.* rejected was the proposition that "any probation conditions reasonably related to enhancing the effective supervision of a probationer" is necessarily permissible. (*Ricardo P., supra,* 7 Cal.5th at p. 1127.) At issue in *Ricardo P.* was an electronic device search condition imposed to monitor the minor's compliance with probation conditions prohibiting him from possessing or using illegal drugs despite the absence of

---

[4] Respondent's argument that the search condition is justified by appellant's criminal history of being dishonest or uncooperative with police officers is not particularly convincing. Respondent points to the evidence that appellant initially fled from the police in the present case and to a prior misdemeanor conviction for providing false information to a police officer. The prior was 20 years old at the time of sentencing. Even assuming appellant's explanation of his initial flight lacked credibility, the record reflects that he cooperated when the officer stopped him a block away, and was cooperative with the officer who interviewed him later and with the probation officer. The evidence of dishonesty or uncooperativeness was thus quite weak and, in any event, respondent does not explain how it would justify a warrantless search condition that was not otherwise justified by the circumstances of the case.

16

any evidence he had ever used an electronic device or social media in connection with the offense (burglary). (*Id.* at p. 1115.) Emphasizing the immense amount of personal information accessible through a search of electronic devices and social media accounts, *Ricardo P.* held the condition imposed a burden on the minor's privacy "substantially disproportionate to the legitimate interests in promoting rehabilitation and public safety." (*Id.* at p. 1129.)

The standard search condition imposed in the present case is quite different. Indeed, *Ricardo P.* pointed out "the potentially greater breadth of searches of electronic devices compared to traditional property or residence searches[,]" noting the United States Supreme Court's observation that " '[a] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.' " (*Ricardo P., supra,* 7 Cal.5th at p. 1127, quoting *Riley v. California* (2014) 573 U.S. 373, 393.) "[P]robation is a privilege and not a right," and "adult probationers, in preference to incarceration, validly may consent to limitations upon their constitutional rights—as, for example, when they agree to warrantless search conditions." (*Olguin, supra,* 45 Cal.4th at p. 384.)

In sum, the marijuana, chemical testing, weapons, and search conditions imposed in the present case are reasonably related to future criminality and therefore valid under *Lent*. Defense counsel's failure to object to the conditions was not deficient representation, and appellant suffered no prejudice.

## II.

Appellant additionally challenges the chemical testing and search conditions as unconstitutionally overbroad. " '[A] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.' " (*Olguin, supra,* 45 Cal.4th at p. 384, quoting *In re Sheena K.* (2007) 40 Cal.4th 875, 890.) "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.)

An overbreadth challenge to a probation condition may be raised on appeal despite the failure to object at trial where it is claimed to be overbroad on its face and is "capable of correction without reference to the particular sentencing record developed at trial." (*In re Sheena K., supra,* 40 Cal.4th at pp. 887–889.) That is not the case here: Appellant contends the conditions are overbroad based on the facts of his offense and history, not facially overbroad. Accordingly, his failure to object at trial forfeited the issue for appeal.

Appellant's argument that he received ineffective assistance of counsel is unavailing because the conditions do not appear to be overbroad. With respect to the chemical testing condition, appellant argues only that the testing condition's intrusion into his Fourth Amendment interests outweighs its promotion of legitimate governmental interests because (in his view) the marijuana condition is not reasonably related to his offense or future criminality. Our rejection of the premise necessarily defeats the argument.

18

Similarly, appellant's argument that the search condition is overbroad is largely based on his view that any search condition is unwarranted by the circumstances of his offense and history. As earlier explained, the search condition is reasonable as a means to monitor appellant's compliance with several specific conditions of his probation, as well as the general condition that he obey all laws. (*Balestra, supra,* 76 Cal.App.4th at p. 67.) Appellant has not demonstrated that defense counsel's failure to object to this standard probation condition fell below "an objective standard of reasonableness under prevailing professional norms" (*Strickland v. Washington, supra,* 466 U.S. at p. 687), or that there is any reasonable probability the trial court would not have imposed the condition if counsel had objected.

## III.

As earlier indicated, appellant was placed on probation for a period of four years. At the time of sentencing, the trial court had discretion to order probation "for a period of time not exceeding the maximum possible term of the sentence" or, where the maximum possible term was five years or less, for a maximum of five years. (Former § 1203.1, subd. (a).) While this appeal was pending, the Legislature enacted Assembly Bill No. 1950 (Assembly Bill 1950), amending section 1203.1, subdivision (a), to limit felony probation to a maximum term of two years, absent circumstances not applicable here. (Stats. 2020, ch. 328, § 2, eff. Jan. 1, 2021.) Appellant argues this legislation is ameliorative and therefore applies to his case pursuant to the reasoning of *In re Estrada* (1965) 63 Cal.2d 740.[5] In accordance with recent cases holding

---

[5] Appellant first raised this claim in a petition for rehearing after we filed an opinion affirming his conviction, arguing rehearing was required to preserve his constitutional right to effective assistance of counsel and forestall a petition for writ of habeas corpus based on ineffective assistance of

Assembly Bill 1950 applies retroactively (*People v. Sims* (2021) 59
Cal.App.5th 943; *People v. Quinn* (2021) 59 Cal.App.5th 874; *People v. Burton*
(2020) 58 Cal.App.5th Supp. 1 [Assem. Bill 1950 limitation on duration of
misdemeanor probation]), respondent agrees.  Respondent argues, however,
that we should remand for the trial court to reduce the term of probation
rather than simply striking the portion of the probation term exceeding two
years.

Respondent contends remand is the appropriate remedy for pending
cases because it allows the trial court to adjust terms of probation so they can
be completed before the termination of probation and to determine whether
probation has been completed successfully.  Respondent points out that the
status of probation at termination is relevant if a probationer seeks
expungement of the record of conviction pursuant to section 1203.4, which he
or she may do "at any time after the termination of the period of probation."
(§ 1203.4, subd. (a).)[6]

---

counsel.  Assembly Bill 1950 was signed by the Governor on September 30,
2020, some two and a half months after appellant's attorney filed the reply
brief on this appeal.  Counsel did not seek leave of court to file a
supplemental brief arguing appellant was entitled to the shortened period of
probation.  (Cal. Rules of Court, rule 8.200(a)(4).)  We granted rehearing to
permit consideration of this claim.

[6] Section 1203.4, subdivision (a), provides that a probationer who has
fulfilled the conditions of probation for the entire period of probation, or
whose early fulfillment of probation conditions results in early termination of
probation, is entitled to expungement of the record of conviction " 'as a matter
of right.' " (*People v. Covington* (2000) 82 Cal.App.4th 1263, 1266, quoting
*People v. Chandler* (1988) 203 Cal.App.3d 782, 787; *People v. Seymour* (2015)
239 Cal.App.4th 1418, 1429–1430; *People v. Johnson* (2012) 211 Cal.App.4th
252, 264.)  Relief under section 1203.4, subdivision (a), may also be available,
subject to the trial court's discretion, " 'in any other case in which a court, in

As appellant was placed on probation on August 31, 2018, the two-year maximum probation period ended on August 31, 2020. Accordingly, no useful purpose would be served by remand. The remaining portion of the originally ordered probation term must be stricken.

## DISPOSITION

Appellant's probation is reduced to a term of two years. In all other respects, the judgment is affirmed.

---

its discretion and the interests of justice, determines that a defendant should be granted the relief available under' section 1203.4." (*Seymour,* at p. 1430.)

_____
Kline, P.J.

We concur:

_____
Richman, J.


_____
Stewart, J.


*People v. Tobar* (A155289)